**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**TYRONE PITTS,**

    **Plaintiff,**

      **v.**　　　　　　　　　　　　　　**Civil Action No.  13-1398 (JEB)**

**HOWARD UNIVERSITY,**

    **Defendant.**

**MEMORANDUM OPINION**

Plaintiff Tyrone Pitts worked at Howard University for fifteen years in a variety of finance-related roles.  In suing Howard, he alleges that it discriminated against him based on his race (black) and created a hostile work environment.  He also contends that, after he raised concerns about tax issues and a possible fraud on the University in 2011, it transferred him to a position with diminished responsibilities and refused to provide him with an evaluation required for a raise.  These facts, he claims, support causes of action for retaliation under the False Claims Act and Title VII, as well as discrimination under Title VII, 42 U.S.C. § 1981, and the D.C. Human Rights Act.  Howard now moves for summary judgment on all counts, and Pitts cross-moves solely on those related to retaliation.  Because disputes of material fact remain on all except Pitts's hostile-work-environment claims, the Court will grant Defendant's Motion in part and deny Plaintiff's in full.

I.　　**Background**

In considering the parties' Motions, the Court recites the relevant facts as presented by both sides, highlighting disputes where material.  Defendant, unfortunately, has complicated this task somewhat.  Ordinarily, a Statement of Undisputed Material Facts consists of just that –

facts, which are in turn supported by reference to testimony and documentation in the record.

Howard, in contrast, has presented several key paragraphs of its Statement as Plaintiff's

<u>contentions</u>.  <u>See, e.g.</u>, DSOF, ¶¶ 5, 16.  For instance, one paragraph reads: "<u>Plaintiff</u> . . .

<u>contends</u> that . . . [a supervisor] referred to 'African Americans on her staff as you people.'"  <u>Id.</u>,

¶ 5 (emphases added).  Yet Howard does not make clear its position with respect to the truth of

such a statement.  Given the demanding summary-judgment standard set forth below, the Court

will assume for the purpose of these Motions that Defendant has conceded its truth.  With that

caveat lodged, the Court moves on to the relevant factual background.

Pitts worked for the University from 1998 until his resignation in 2013.  <u>See</u> PSOF, ¶ 1.

After starting as a Section Chief in the Office of the Controller, he was promoted to Director of

Cash Management in 1999, and then to Senior Treasurer Director in 2007.  <u>See id.</u>, ¶ 2.  In

January 2010, he was again elevated, this time to Assistant Treasurer – the top position in the

Office of the Assistant Treasurer.  <u>See id.</u>, ¶ 3; DSOF, ¶ 1.  Pursuant to this promotion, Plaintiff

assumed responsibility over treasury, the cashier's office, and accounts payable, and he received

an attendant salary increase.  <u>See</u> DSOF, ¶ 2.  He reported directly to Chief Financial Officer

Robert Tarola and Deputy CFO Bridget Sarikas and was himself put in charge of 26 employees.

<u>See</u> PSOF, ¶¶ 3-4.

Pitts's troubles began in March 2010.  <u>See</u> DSOF, ¶ 10.  Upon the departure of a

colleague who had handled Howard's taxes, the University put Plaintiff in charge of them.  <u>See</u>

<u>id.</u>  While researching his new duties, he discovered unpaid tax levies.  <u>See id.</u>, ¶ 11.  After

bringing these to the attention of Tarola and Sarikas, he was instructed to develop a task force to

further evaluate the issue.  <u>See id.</u>  This task force, in turn, prepared a memo of recommendations

to address the unpaid tax levies and other tax matters it uncovered.  <u>See id.</u>, ¶ 12.  Upon the

suggestion of Chief Operating Officer Troy Stovall, the group recommended that a company called ADP be brought in to address Howard's tax problems.  See id., ¶ 13.  Tarola did not take the recommendation, selecting instead another consulting firm, Urish Popeck.  See id., ¶ 15.

Plaintiff found this surprising because – in his opinion – Urish Popeck did not have the requisite expertise for the task at hand.  See Mot., Exh. 1 (Deposition of Tyrone Pitts) at 141:1-142:4.  What it did have was a preexisting business relationship with Tarola.  See PSOF, ¶ 14.  Once Urish Popeck was brought on board, moreover, Tarola and Sarikas directed Plaintiff to abandon his work on tax matters.  See id.  In response, Plaintiff voiced several related concerns to management.  See DSOF, ¶ 16.  It appeared to him, for instance, that although Urish Popeck had been hired by Tarola, "no one knew they were [there]."  Pitts Dep. at 79:15-17.  According to Pitts, when he told Stovall that the firm was being paid $300,000 a month, Stovall was surprised because he was not aware of its engagement, yet any company charging that much money would have needed to go through the procurement process.  See id. at 79:20-80:10.  Pitts also spoke with Stovall about the fact that, based on his research, Howard was paying Tarola a disproportionately high salary.  See id. at 83:3-10.

Pitts's concerns did not end there.  He also warned management that Tarola was overstating the revenue collected from the Department for Research by "commingling Pell Grant numbers and research numbers."  DSOF, ¶ 20.  On this topic, he spoke with Dr. Florence Bonner, the Vice President of Research.  After staying at work one weekend, Plaintiff "got all the numbers together for her and presented it for her.  Because [Pitts] didn't know what [Tarola] was presenting for her area, . . . [he] gave her what the actual facts were from the bank statements, exactly what happened.  And [they] looked at the numbers for whatever [Tarola] was presenting, and they were totally off."  Pitts Dep. at 85:21-86:17.

Aside from these financial concerns, Pitts also found the workplace racially inhospitable. In March 2010, for instance, Sarikas, who is white, referred to blacks on her staff as "you people." DSOF, ¶ 5. Then, in May, she used the phrase again, stating, "I don't understand you people," when an email was sent to the public without her review. See id. Although it is not entirely clear based on the state of the record, there may have been a third time she used the phrase. See id., ¶ 6; but see Pitts Dep. at 39:11-12 ("Those are the only two times I can remember [her using the phrase] . . . .") (emphasis added). Pitts's issues with Sarikas did not end there; he also concluded that she did not understand "treasury management issues," DSOF, ¶ 8 (quoting Pitts Dep. at 24:5), questioned her training, and was concerned with the fact that she and Tarola were in a romantic relationship. See Pl.'s Resp. to DSOF, ¶ 9.

In response to all of this, on October 7, 2010, Plaintiff filed an official internal complaint with Antwan Lofton, Director of Howard's EEO office, alleging a hostile work environment and a pattern of discrimination against black employees. See PSOF, ¶ 8. He followed this up less than three weeks later with a formal charge with the Equal Employment Opportunity Commission and the D.C. Office of Human Rights, alleging discrimination, harassment, and retaliation. See id., ¶ 9.

Five months later, in March 2011, Pitts was transferred to the position of Payroll and Budget Officer, also known as Director of Payroll. Id., ¶ 16 (transfer occurred on March 22); Def.'s Resp. to PSOF, ¶ 16 (transfer occurred on March 21). The parties, unsurprisingly, view the reassignment through different lenses. Defendant claims that Pitts was "offered" the position; according to Plaintiff, he was told that if he did not accept it, Tarola would fire him. Compare DSOF, ¶ 26 with Pl.'s Resp. to DSOF, ¶ 26. The new role was in the Human Resources department, and Plaintiff was put under the supervision of Jimmy Jones. See DSOF,

¶ 27. Although his salary and benefits remained the same, he nonetheless considered the transfer a demotion because he could not use his acquired skill set in the new position. See id., ¶ 32. Plaintiff also claims that the position of Payroll and Budget Officer involved "fewer direct reports" than he had as Assistant Treasurer. See PSOF, ¶ 19. As will be further detailed below, Defendant disputes the accuracy of this assessment.

Plaintiff then received a letter dated October 31, 2011, from Howard Deputy Counsel Leroy Jenkins. See id., ¶ 17. In the letter, Jenkins indicated that Tarola and Sarikas "had received counseling" concerning "the manner, tone and language used to communicate with employees on their staffs." Def. Opp., Exh. 4 (October 31, 2011, letter from Leroy Jenkins to Tyrone Pitts). The letter also noted that it represented "the disposition" of Plaintiff's EEO complaint. See id. Pitts nonetheless received a second letter from Jenkins on November 7, 2011. See PSOF, ¶ 18. In this letter, Plaintiff was informed that "Howard University acted on a recommendation to re-assign [him] to the Office of Human Resources to function as its Director of Payroll," although Pitts had been in that position since March. See id.

Then on July 1, 2012, Plaintiff was again transferred. See id., ¶ 20. This time he was returned to the Department of the CFO, back under the supervision of Tarola and Sarikas, but without the restoration of his former title and responsibilities. See id. Pitts had earlier emailed Lofton in anticipation of the move, expressing concerns that this re-transfer was retaliatory in nature. See id., ¶ 21. He followed up on this email twice, requesting an update and expressing concerns about the move. Id. Lofton eventually responded to Pitts, but informed him that he could not provide documentation explaining Howard's decision to transfer him back to the Department of the CFO. See id., ¶ 22. Plaintiff ultimately resigned in October 2013, citing ongoing harassment and retaliation as the reasons for his leaving. See id., ¶ 24.

After exhausting his EEOC administrative remedies, on September 13, 2013, Pitts filed this Complaint, which includes five counts: (1) retaliation pursuant to the False Claims Act, 31 U.S.C. § 3730(h); (2)-(4) race discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, 42 U.S.C. § 1981, and the District of Columbia Human Rights Act; and (5) retaliation pursuant to 42 U.S.C. § 2000e-3.  As will be discussed below, Plaintiff's race-discrimination counts – when read liberally – include both hostile-work-environment and direct-discrimination claims.  Defendant now moves for summary judgment on all counts, and Pitts cross-moves on his retaliation claims (Counts I and V) alone.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v.

6

Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*).  On a motion for summary

judgment, the Court must "eschew making credibility determinations or weighing the evidence."

Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

     The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations, or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant,

in other words, is required to provide evidence that would permit a reasonable jury to find in her

favor.  See Laningham v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

**III.**    **Analysis**

     Because the parties have cross-moved on Pitts's counts of FCA and Title VII retaliation,

the Court will begin with these.  It will then analyze Defendant's Motion as it relates to the

remaining claims of race discrimination.

    A.  FCA Retaliation (Count I)

     The False Claims Act prohibits a false or fraudulent request or demand for money from

the United States Government, as well as false statements or acts intended to defraud the

Government of money or property, and it empowers private individuals to bring civil actions for

the recovery of damages in the Government's name – so called *qui tam* actions.  See 31 U.S.C.

§§ 3729-33.  Section 3730(h), moreover, permits an employee to sue for retaliation where his

employer discriminated against him because of actions he took "in furtherance of [an FCA suit]

or other efforts to stop [one] or more violations of this subchapter."  "[T]o make out a claim of

retaliation, an employee must demonstrate that: (1) he engaged in protected activity, that is, 'acts

done . . . in furtherance of an action under this section'; and (2) he was discriminated against

'because of' that activity." <u>United States ex rel. Yesudian v. Howard University</u>, 153 F.3d 731,

736 (D.C. Cir. 1998) (quoting 31 U.S.C. § 3730(h)).  This second causal element, in turn,

requires a showing that "(a) the employer had knowledge the employee was engaged in protected

activity; and (b) the retaliation was motivated, at least in part, by the employee's engaging in

[that] protected activity."  <u>Id.</u> (quotation marks omitted).  Thus boiled down to its essentials, an

FCA retaliation claim requires: (1) protected activity; (2) notice; and (3) adverse action taken in

response to such protected activity.

      According to Pitts, he satisfies all three elements because the undisputed facts reveal that:

his investigation into Howard's financials was protected activity; the University was on notice

that he was looking into potential fraud; and it retaliated against him by demoting him and

refusing to provide him with an evaluation required for a raise.  Defendant counters that the facts

support none of the requirements of an FCA retaliation claim.  The Court addresses the three

issues separately, bearing in mind that Plaintiff must prevail on each of the three elements, while

Defendant need only triumph on one to gain summary judgment.

      1.  *Protected Activity*

      Plaintiff alleges that he engaged in protected activity by investigating Howard's tax

issues and possible fraud on the University.  As will be discussed in more detail below, FCA

fraud may exist here if Howard is a victim, given its status as a significant federal grantee.

Howard, for its part, contends that "Plaintiff cannot show that he was engaged in a protected

activity in furtherance of a *qui tam* action under the FCA's whistleblower provision."  Mot. at

10.  Its central argument on this point is that Pitts was not investigating any type of actual fraud.

As Defendant tells it, Plaintiff "express[ed] concerns" about tax levies, was interested in Tarola's

salary, and was curious about Urish Popeck's relationship with Howard because it was his job to

concern himself with the finances of the University.  Id. at 10-12 (citing Pitts Dep. 79:14-80:10).

Merely discharging his duties as Assistant Treasurer, Defendant concludes, is not enough to be

protected here.  The Court disagrees.

The standard for protected activity in this context is capacious.  An employee need not

file – or even prepare to file – a private *qui tam* action to render his conduct protected.  See

Yesudian, 153 F.3d at 740.  Instead, employees who "are collecting information about a possible

fraud, before they have put all the pieces of the puzzle together" are also covered.  Id.  In other

words, "it is sufficient that a plaintiff be investigating matters that 'reasonably could lead' to a

viable False Claims Act case."  Id. (citation omitted).  Indeed, it is not even "necessary [that a

plaintiff] 'know' that the investigation he was pursuing could lead to a False Claims Act suit."

Id. at 741 (citations omitted).  "An initial investigation may well further an action under the Act,

even though the employee does not know it at the time of the investigation."  Id.

It is true, as Defendant points out, that an "investigation of nothing more than [an]

employer's non-compliance with . . . regulations" does not constitute protected activity.  Id. at

740.  It is equally true, however, that when such an investigation "concern[s] 'false or fraudulent'

claims," it can "be covered by the [FCA]."  Id. (quoting 31 U.S.C. § 3729(a)).  Admittedly, the

line between "merely" policing regulatory compliance, on the one hand, and investigating fraud,

on the other, can be a hazy one – and the inquiry is fact specific.  See Shekoyan v. Sibley Int'l,

409 F.3d 414, 423 (D.C. Cir. 2005).  In this case, a reasonable jury could find Pitts's activity was

protected.

By Plaintiff's account, he raised tax concerns with Tarola and Sarikas, and he developed

a task force on the matter, which ultimately recommended ADP to help solve Howard's tax

problems.  See DSOF, ¶ 11.  Instead, Tarola brought in Urish Popeck.  See id., ¶ 15.  This was

alarming to Plaintiff, considering the following facts: (1) Tarola had an existing business relationship with Urish Popeck; (2) Plaintiff believed it to be unqualified for the task; (3) Howard was paying the firm $300,000 a month; and (4) Pitts suspected that Tarola may have brought the company on without following proper procurement procedures.  See Cross-Mot. & Opp., Declaration of Tyrone Pitts, ¶¶ 8-9; Pitts Dep. at 79:15-17.  If this were not enough, Pitts also raised concerns about Tarola's overstatement of revenue – importantly, by mishandling federal grants – and he noted that his pay far outpaced industry standards.  See DSOF, ¶ 20.  A jury could find that this investigative activity – when aggregated – could have reasonably uncovered fraud and is thus protected.  See, e.g., Yesudian, 153 F.3d at 740 (finding "more than enough evidence for a reasonable juror to conclude that [plaintiff] was engaged in [protected activity]" where he "repeatedly advised [his] superiors that he had evidence [his employer] falsified time and attendance records, provided inside information to favored vendors to aid them in the bidding process, accepted bribes from vendors, permitted payments to vendors who did not provide services to the University, and took University property home for personal use").

Defendant further argues that Pitts cannot succeed because he has "failed to establish evidence of any false or fraudulent claim that was presented or caused to be presented by Howard to the government for payment or approval with the knowledge that the claim was false."  Mot. at 12 (emphasis added).  In the absence of such evidence, it concludes, there is not even a "distinct possibility" that his investigation could have led to a successful FCA claim.  See id. (citing Glynn v. Impact Science & Tech., Inc., 807 F. Supp. 2d 391, 403-404 (D. Md. 2011) ("The distinct-possibility standard serves a gatekeeping function, permitting only situations in which litigation could be filed legitimately and excluding those in which an employee . . .

fabricates a tale of fraud to extract concessions from the employer, or . . . just imagines fraud but lacks proof.")).

Howard is wrong.  Indeed, its argument is foreclosed by <u>Yesudian</u>.  In that case, the D.C. Circuit concluded that it was likely that a *qui tam* suit could be brought by someone alleging the presentation of a false claim to certain federal <u>grantees</u>, not just to the federal government, since such claims would be "'effectively' presented to the United States because the payment comes out of funds the federal government gave the grantee."  <u>Yesudian</u>, 153 F.3d at 738.  Howard was also the defendant in <u>Yesudian</u>, and the court there found a sufficiently close nexus between the claim on the University, a significant federal grantee, and a claim on the United States.  <u>See id.</u> at 738-39.  The D.C. Circuit ultimately concluded, however, that it need not decide this question since, as discussed above, retaliation could be taken against someone involved in the <u>investigation</u> of an FCA claim, even if a false claim was never resubmitted by the grantee to the federal government.  <u>Id.</u> at 739-40.

In the end, crediting Plaintiff's evidence, a jury could find that he was investigating possible fraud and that there was a chance his investigation could have led to an FCA suit.  It could conclude, therefore, that his activities were protected and that he has met the first element.  Yet, as the Court noted earlier, the protected-activity inquiry is fact specific, and this is a reasonably close case.  While a jury could find that Pitts was investigating potential fraud, it could just as easily determine that he was merely policing Howard's financials.  Summary judgment to Pitts on this count is thus unwarranted as well.

     2.  *Notice*

Defendant next maintains that it was not put on notice that Plaintiff was engaged in any protected activity.  In the FCA retaliation context, "[t]he standard for notice . . . is flexible: 'the

11

kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged.'" U.S. ex rel. Williams v. Martin-Baker Aircraft Co., 389 F.3d 1251, 1260 (D.C. Cir. 2004) (quoting Yesudian, 153 F.3d at 742).

Howard contends that because the standard is situation specific, "the D.C. Circuit Court . . . and other Circuit Courts have imposed a heightened notice requirement for employees whose job descriptions include audit, monitoring, or reporting functions." Mot. at 13 (citing, e.g., Yesudian, 145 F.3d at 744-45). Defendant is correct that "plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must overcome the presumption that they are merely acting in accordance with their employment obligations to put their employers on notice." Martin-Baker, 389 F.3d at 1261 (internal quotation marks omitted). "[M]erely grumbling to the employer about job dissatisfaction or regulatory violations does not satisfy the requirement – just as it does not constitute protected activity in the first place." Yesudian, 153 F.3d at 744. In this regard, the key to the notice component is an employer's awareness that an investigation might uncover fraud because otherwise it "'could not possess the retaliatory intent necessary to establish a violation of § 3730(h).'" Id. (quoting U.S. ex rel. Hopper v. Anton, 91 F.3d 1261, 1269 (9th Cir. 1996)).

In arguing that it lacked the requisite notice, Howard again offers a minimizing gloss on Pitts's activities: he "stumbl[ed] upon unpaid tax levies while rummaging through a former colleague's office," "provid[ed] revenue information to a . . . department head who [had] requested it," and "grumbl[ed] to the [COO] about the salary of the CFO and/or service fee of a contractor." Mot. at 13-14. Because these activities were "indistinguishable from the reporting expected as a part of [his] job," Howard concludes, he was required "to do something more" to

overcome the <u>Martin-Baker</u> presumption and "'make clear [his] intentions of bringing or assisting in a False Claims Act.'"  <u>Id.</u> (quoting <u>Yesudian</u>, 153 F.3d at 744).

Although it is another close question, the Court concludes that a reasonable jury could find in Pitts's favor on this element.  To begin, it is not clear that the presumption against notice should even apply here because Pitts's job was not exclusively or even principally about "ensur[ing] compliance with government contracts."  <u>Cf.</u> <u>U.S. ex rel. Schweizer v. Oce N.V.</u>, 677 F.3d 1228, 1239 (D.C. Cir. 2012).  Presumably his investigative activities would have stood out to the University here more than they would for an employee whose <u>sole</u> occupation was policing regulatory compliance.  <u>See, e.g.</u>, <u>Pencheng Si v. Laogai Research Found.</u>, No. 09-2388, 2014 WL 5446487, at *18 (D.D.C. Oct. 14, 2014) (rejecting argument that <u>Martin-Baker</u> presumption applied where plaintiff was never "responsible for Defendants' compliance but merely had access to some billing and accounting information").

Even if the presumption were applicable, moreover, Pitts engaged in activity that could have put Howard on adequate notice for FCA retaliation.  The ultimate question is whether he acted "outside [his] normal job responsibilities, notif[ied] a party outside the usual chain of command, advis[ed] [Howard] to hire counsel, or [took] 'any [other] action which a factfinder reasonably could conclude would put [Defendant] on notice that litigation [was] a reasonable possibility.'"  <u>Schweizer</u>, 677 F.3d at 1239 (quoting <u>Martin-Baker</u>, 389 F.3d at 1261); <u>Bland-Collins v. Howard Univ.</u>, 19 F. Supp. 3d 252, 257-58 (D.D.C. 2014).  In this case, concerned with the activities of Tarola (to whom he reported), Pitts voiced his concerns outside his usual chain of command – namely, to the COO and the head of another department.  <u>See</u> Pitts Dep. at 85:21-86:17.  And the substance of these concerns went beyond mere compliance; they centered on the possible mismanagement of federal grants and the funneling of funds to a third-party

contractor with which Tarola had a business relationship. Viewing the record in the light most favorable to Pitts, a reasonable jury could find that his activities would have put Howard on notice that he "[was] investigating fraud" – that is, notice sufficient to support an inference of retaliatory motivation. Yesudian, 153 F.3d at 744; Schweizer, 677 F.3d at 1238-39.

3. *Adverse Action in Response*

Finally, Defendant contends that no retaliatory action was taken against Pitts. Howard does not argue a lack of causation, maintaining instead that Plaintiff suffered no adverse action. In this context, an action must be such that "a reasonable employee would have found . . . [it] materially adverse," which means "it well might have dissuaded a reasonable worker from [engaging in protected activity]." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006) (citation and internal quotation marks omitted). Such adverse actions may include "[w]ithdrawing an employee's supervisory duties" or a "reassignment with significantly different responsibilities." Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007) (internal quotation marks and citations omitted).

According to Plaintiff, the University retaliated when it (1) refused to furnish him with an evaluation (which disqualified him for a raise above a cost-of-living allowance) and (2) demoted him through transfers that stripped him of responsibilities and supervisory functions. Defendant counters that the undisputed facts belie both assertions.

a. Evaluation

In his Complaint, Pitts alleged that Howard retaliated against him by failing "to provide [him] with a performance appraisal, thereby making him ineligible for a raise beyond the 3% cost of living allowance." Compl., ¶ 30. And Defendant admitted earlier in litigation that, indeed, "Tyrone Pitts did not receive a performance review from Howard University in July

2011." Cross-Mot. & Opp., Exh. 2 (Defendant's Supplemental Answers and Objections to

Plaintiff's Requests for Admissions), ¶ 15.  Howard now contends, however, that Plaintiff did, in

fact, receive favorable evaluations for both 2010 and 2011.

According to Defendant, Pitts prepared "his own self-evaluation of favorable remarks in

summer 2010 for his work as Assistant Treasurer . . . , which was later supplemented and

modified by Ms. Sarikas, resulting in a favorable assessment that Plaintiff exceeded

requirements."  DSOF, ¶ 24.  To substantiate this claim, Defendant has presented a positive

performance evaluation for 2010, which is signed by both Pitts and Sarikas.  See Mot., Exh. 2

(2010 Performance Evaluation).  Plaintiff, however, maintains that this evaluation was not

validly recorded such that he would have been eligible for a raise.

When confronted with this document in his deposition, Plaintiff admitted that Sarikas had

asked him to fill it out in anticipation of a meeting, but clarified that the meeting never

materialized.  See Pitts Dep. at 126:8-10.  He was thus forced to submit the review himself:

> [T]his document was filled out by me and turned in to human
> resources.  I gave it to Amy Spicer because no document was done
> for me. . . .  Bridget hadn't seen this document because she no
> longer was dealing with me. . . .  [Spicer] asked me to sign it
> because she said she couldn't accept it without my signature.  So I
> turned this in to HR myself.

Id. at 123:9-18.

A review of the evaluation reveals computer-generated comments (input by Pitts) that are

then edited and supplemented by hand.  See 2010 Performance Evaluation.  According to

Plaintiff, when he gave the evaluation to HR, it had not been modified in pen, and it had not been

signed by Sarikas.  See Cross-Mot. & Opp., Exh. 1 (Deposition of Tyrone Pitts) at 125:2-10;

123:20-22 ("[T]his document that you presented before me, I have never seen this because this –

this document has changes on it . . . .").  Although a 2010 Performance Evaluation exists,

therefore, Plaintiff contends that he did not have a "valid performance appraisal on record" at the relevant time, which adversely affected his pay.  See Cross-Mot. & Opp. at 14.  Because neither party has presented evidence on precisely what is required to have a "valid performance appraisal," the Court concludes that a material dispute remains as to the significance of this document.

Defendant also asserts that Jones (Pitts's interim supervisor) approved a 2011 self-evaluation prepared by Plaintiff.  See DSOF, ¶ 34.  As Pitts points out, however, Howard has not provided any such evaluation.  See Pl.'s Resp. to DSOF, ¶ 34.  Instead, the only evidence Howard forwards on this front is an email from Jones to Pitts in July 2011 noting that he had "reviewed" Pitts's "self-evaluation" and was "aligned with the evaluation."  See Mot., Exh. 3 (July 27, 2011, email from Jimmy Jones to Tyrone Pitts).  In light of Defendant's conflicting representations on the issue and considering the disputes as to the import of the 2010 performance evaluation provided by the University, the Court concludes that a factual dispute remains as to whether Plaintiff received a properly approved evaluation for 2010 and 2011.

The Court also finds this dispute material.  Howard argues that even if Pitts were not given a proper evaluation, such failure could not be adverse.  As it points out, "'[T]he D.C. Circuit has held that mere criticism of an employee's performance does not amount to an adverse employment action unless it is connected with a tangible harm.'"  Def.'s Rep. at 12 n.3 (quoting Taylor v. Mills, 892 F. Supp. 2d 124, 147 (D.D.C. 2012)).  This argument misses the mark.  Plaintiff's complaint is not principally about the "negative" nature of an evaluation.  He instead alleges that the failure to properly evaluate him directly affected his pay – that is, it was "connected with a tangible harm."  Taylor, 892 F. Supp. 2d at 147.

A dispute of material fact, therefore, remains on Plaintiff's allegation that he was made ineligible for a raise.

>    b.   Transfer

Defendant also contends that Plaintiff's transfer was not adverse.  According to Pitts, his reassignment as a Payroll and Budget officer was a demotion because it was "recognized by Howard as a lesser (inferior) position in terms of responsibility and leadership at the University." Pitts. Decl., ¶ 12.  Specifically, he testified that it had "significantly diminished responsibilities," and whereas he "was responsible for supervising 26 different positions" as Assistant Treasurer, his new position "included the supervision of only four direct reports." Id.

Such allegations, if true, could support a finding of adverse action.  For instance, "reassignment with significantly different responsibilities" can suffice.  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998).  And "withdrawing an employee's supervisory duties" also "constitutes an adverse employment action."  Stewart v. Ashcroft, 352 F.3d 422, 427 (D.C. Cir. 2003); see also Burke v. Gould, 286 F.3d 513, 522 (D.C. Cir. 2002) ("[W]e have no doubt that the removal of [plaintiff's] supervisory responsibilities constituted an adverse employment action.").  Indeed, "a material reduction of supervisory responsibilities, no less than a total deprivation of such responsibilities, can amount to an adverse employment action."  Ohal v. Board of Trustees of Univ. of Dist. of Columbia, 100 Fed. App'x 833, 834 (D.C. Cir. 2004) (citing Stewart, 352 F.3d at 422).

Defendant argues that Plaintiff's transfer was not so adverse as he lets on.  It highlights that his salary and benefits remained the same, and it disputes Plaintiff's assertions that he had fewer responsibilities and fewer supervisory functions.  See Mot. at 21.  As for responsibilities, it contends that (1) Plaintiff had done some payroll work before being transferred, and (2) he had

positive things to say about his new position.  See DSOF, ¶¶ 33-35.  Neither assertion, however, is particularly relevant.  The fact that Plaintiff's new assignment consisted of one of his previous duties does not show his responsibilities were not diminished – and his positive attitude about the change is hardly pertinent to whether it was adverse.  On the other hand, Plaintiff has provided the thinnest of substantiation on this front – namely, the bald claim that the new position had "significantly diminished responsibilities."  Pitts Decl., ¶ 12.  On this record, therefore, it is not entirely clear exactly how much his substantive responsibilities changed in the transfer.

As for supervisory functions, Defendant claims that Pitts "acknowledg[ed] at deposition that he, in fact, ultimately had direct supervisory responsibility to perform performance evaluations for only four employees as Assistant Treasurer," which is the "the exact same number of employees for whom Plaintiff had direct supervisory responsibility to perform performance evaluations as Director of Payroll/Budget."  Mot. at 22 (citing DSOF, ¶ 36).  This evidence, Defendant concludes, demonstrates that nothing changed in the reassignment.

There are two problems with this argument.  First, it misstates the evidence.  Contrary to Defendant's assertions, Plaintiff testified that he did at least participate in the evaluations of all 26 employees he oversaw as Assistant Treasurer.  See Pitts. Dep. at 128:10-12 ("I did evaluation of the [four] heads.  But I also had to sign the other 26, and I – and I had to go through the process with them.").  Second, even if Howard's characterization of the evidence were accurate, its conclusion would not follow.  Defendant equates an employee's supervisory capacity with the number of his direct reports, but never fully explains why this should be the case.  Presumably, it would be a demotion to be transferred from the head of a thousand-person division with four direct reports to a regional office with four total employees, all of whom also "directly report."  Yet on Howard's theory, this transfer would not constitute a diminution in supervisory functions.

The most relevant comparator, it seems, would be the change in total employees under Pitts's management.  And while the parties agree that he ultimately oversaw 26 employees as Assistant Treasurer, it is not crystal clear on this record what that number was in his new position because all Plaintiff ever avers on this issue is that it "included the supervision of only <u>four direct reports</u>."  Pitts Decl., ¶ 12 (emphasis added).

Drawing the inferences in Pitts's favor, however, this would mean a reduction by over 80% of his reports, accompanied by diminished substantive responsibilities, which together could constitute an adverse action.  <u>See</u> <u>Peters</u>, 475 F.3d at 364.  Add in Plaintiff's inability to obtain a raise beyond the COLA, and he defeats Howard's Motion on this issue.  The disputes of fact nonetheless also preclude summary judgment in Plaintiff's favor – even if he had prevailed as a matter of law on the protected-activity question, which he did not.  <u>See</u> part III.A.1, <u>supra</u>.  Because there is evidence that he did, in fact, receive positive evaluations, and because it is not clear on this record exactly how much his responsibilities and supervisory functions changed in the transfer, the question must go to a jury.  <u>See, e.g.</u>, <u>id.</u> at 365 ("Whether a particular reassignment of duties constitutes an adverse action . . . is generally a jury question.") (internal citation omitted).

*     *     *

In the end, Plaintiff has provided evidence sufficient for a jury to find that he engaged in protected activity and that Howard retaliated against him through adverse actions that were motivated, at least in part, by knowledge of that activity.  He has not, however, submitted evidence that these findings follow as a matter of law.  The Court will therefore deny both parties' Motions for Summary Judgment on this count.

B.  Title VII Retaliation (Count V)

In a second retaliation count, Pitts alleges that the adverse actions he suffered were motivated by his protected EEO activity.  Title VII prohibits not only discrimination, but also "retaliation based upon an employee's having 'made a charge, testified, assisted, or participated in any manner' in a Title VII 'investigation, proceeding, or hearing.'"  Hernandez v. Pritzker, 741 F.3d 129, 133 (D.C. Cir. 2013) (quoting 42 U.S.C. § 2000e–3(a)).  To prove a retaliation claim, Pitts must show (1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action; and (3) that a causal link connects the two.  See Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Employees of Library of Cong., Inc. v. Billington, 737 F.3d 767, 772 (D.C. Cir. 2013) (citing Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009)).

According to Pitts, he engaged in protected activity by filing an EEO complaint on racial grounds, and, as a direct result of that activity, he was refused a performance evaluation and subjected to transfers that amounted to a demotion.  As with the FCA claim, the parties have cross-moved for summary judgment on this count, but the resolution of these opposing Motions is made simpler by the Court's foregoing analysis.  Howard does not challenge Plaintiff on the first and third elements of his claim, but raises only the issue of adverse action.  As the Court has just explained that a factual dispute exists as to this element, summary judgment is not warranted for either party on this count.

C.  Hostile Work Environment (Counts II, III, and IV)

Finally, Howard seeks summary judgment on Pitts's race-discrimination counts.  Although not clearly delineated, it appears in his Complaint that Plaintiff forwards both hostile-work-environment and direct-discrimination claims in Counts II-IV.  See, e.g., Compl. ¶ 39 (Defendant . . . creat[ed] a hostile work environment . . . ."); id., ¶ 41 ("Defendant's practices and

procedures have produced a disparate impact upon Mr. Pitts, as an African American employee, with respect to the terms and conditions of his employment.").  In moving for summary judgment, Defendant also distinguishes between the two, asserting that "Plaintiff cannot show any discriminatory employment practice by Howard or any hostile work environment."  Mot. at 17 (emphasis added).  Yet its arguments only address the viability of Pitts's hostile-work-environment claim.  See id. at 17-19.  In response, Pitts follows suit; although he alludes to "discrimination claims and hostile work environment claims" in the heading of the relevant section of his brief, his arguments only address the latter.  See Cross-Mot. & Opp. at 19-21.  The Court, accordingly, will so limit its analysis.

Plaintiff brings these allegations pursuant to three separate statutory schemes – Title VII, Section 1981, and the DCHRA – but they are analyzed under the same framework.  See Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 576 (D.C. Cir. 2013) ("In Section 1981 and Title VII cases, courts use the same framework for determining whether unlawful discrimination occurred."); Jackson v. D.C., 783 F. Supp. 2d 9, 11 (D.D.C. 2009) ("Employment discrimination claims under the D.C. Human Rights Act are analyzed using the same legal framework as federal employment discrimination claims under Title VII.") (citing McFarland v. George Wash. Univ., 935 A.2d 337, 346 (D.C. 2007)); Briscoe v. Costco Wholesale Corp., No. 14-155, 2014 WL 3725338, at *4 (D.D.C. July 29, 2014) ("The legal standard for a hostile work environment claim under the DCHRA is 'substantial[ly] similar' to the standard for harassment claims under Title VII.") (quoting Carpenter v. Fed. Nat'l Mortg. Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999)) (alterations in the original).

"To prevail on a hostile work environment claim, a plaintiff must first show that he or she was subjected to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ayissi-Etoh, 712 F.3d at 577-78 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)). "In evaluating a hostile work environment claim, the court 'looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance.'" Id. (quoting Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008)). "The Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" George v. Leavitt, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). By adhering to these standards, the Court thereby "ensure[s] that [employment-discrimination law] does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace." Faragher, 524 U.S. at 788 (citation and internal quotation marks omitted).

In this case, viewing the evidence in the light most favorable to Pitts, the Court finds that the limited facts on the record do not, as a matter of law, satisfy the "demanding standard" for a hostile-work-environment claim. See Baird v. Gotbaum, 662 F.3d 1246, 1251 (D.C. Cir. 2011). Plaintiff complains broadly in these counts about his exclusion from meetings regarding tax issues, his alleged demotion, and Howard's failure to provide performance evaluations, but fails to connect any of these actions to his race. See Cross-Mot. & Opp. at 19-21. Yet, in this context, "it must be clear that the hostile work environment was the result of discrimination based on a protected status." Kelley v. Billington, 370 F. Supp. 2d 151, 157 (D.D.C. 2005). "'It is . . . important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.'" Id. (quoting Alfano v. Costello,

294 F.3d 365, 377 (2d Cir. 2002)); see also Jones v. Billington, 12 F. Supp. 2d 1, 12 (D.D.C.

1997), aff'd, No. 98-5014, 1998 WL 389101 (D.C. Cir. June 30, 1998) (hostile-work-

environment claim failed where plaintiff had "not demonstrated that any of the conduct of which

he complain[ed] was related to his race, or that his workplace was permeated with racially

discriminatory behavior").

      The only objectionable conduct Pitts identifies that is connected to his race is Sarikas's

two (or three) uses of the phrase "you people" in reference to Pitts and, allegedly, other black

employees.  See Cross-Mot. & Opp. at 19-21.  Although clearly inappropriate, Sarikas's

statements – even if racially charged – in no way approach the bar set for this type of cause of

action.  Cf., e.g., Badibanga v. Howard Univ. Hosp., 679 F. Supp. 2d 99, 104 (D.D.C. 2010)

(dismissing hostile-work-environment claim where plaintiff was placed on administrative leave

due to false accusation, his accent was criticized, he was told he was easy to replace with an

American, and he was told that his supervisor would not hire other Africans); Leavitt, 407 F.3d

at 416-17 (statements by three employees over six-month period that plaintiff should "go back

where she came from," separate acts of yelling, and hostility did not rise to level of severity

necessary to find hostile work environment).

      Because no reasonable jury could find for Plaintiff, the Court will grant Defendant's

Motion for Summary Judgment as to Plaintiff's hostile-work-environment claims in Counts II,

III, and IV.

## IV.     Conclusion

For the foregoing reasons, the Court will deny Plaintiff's Motion in full and grant

Defendant's in part as to the hostile-work-environment claims in Counts II, III, and IV.


/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  July 1, 2015